MELIA BELLI, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Belli v. Commissioner
Docket Nos. 6869-87; 6870-87; 8249-87; 1527-88
United States Tax Court
T.C. Memo 1989-403; 1989 Tax Ct. Memo LEXIS 401; 57 T.C.M. (CCH) 1172; T.C.M. (RIA) 89403; August 2, 1989
*401 Held: On the facts, the transfer of ownership of two adjoining buildings from MMB to his children found to be a gift rather than an installment sale. Failure to report such transfer as a gift not due to fraud. John M. Youngquist, for the petitioners in docket Nos. 6869-87, 8249-87, and 1527-88. Kenneth E. North, for the petitioner in docket No. 6870-87. Martin D. Cohen and Margaret K. Hebert, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined the following income and gift tax deficiencies and additions to tax: Re: Docket No. 6869-87 - Melia Belli (Melia) Addition to Tax
Type of
Deficiency
Section 6661
Tax
Year
(Rounded)
(Rounded)
Income
1982
$ 47,586
$ 11,896
1983
25,001
6,252
1984
33,068
8,267
Re: Docket No. 6870-87 - Melvin Caesar Belli (Caesar) Addition to Tax
Type of
Deficiency
Sec. 6651
Sec. 6653(a)
Sec. 6661
Tax
Year
(Rounded)
(Rounded)
Income
1982
$ 51,926
$ 5,193
* $ 2,596
$ 12,982
1983
34,577
1,729
* 1,729
8,644 1984
35,979
-0-
* 1,799
8,995 *403 Re: Docket No. 8249-87 - Melvin M. (Melvin Belli) and Lia T. Belli Addition to Tax
Type of
Sec. 6653(a)
Sec. 6653(b)
Sec. 6661
Tax
Year
Deficiency
(Rounded)
Income
1978
* $  11,651
$   583
-0-
-0-
1981
* 58,950 ** 2,948 *** $ 29,475
-0-
1982
133,686 ** 6,684 *** 66,843
$ 33,422
Re: Docket No. 1527-88 - Melvin M. Belli
Type of
Addition to Tax
Tax
Year
Deficiency
Section 6653(b)
Gift
1978
* $   888,175
$   444,088
1981
839,517
419,758
1982
* 72,400
36,200
1983
3,161
1,581
1984
* 2,054,851
1,027,425 *404 All section references are to the Internal Revenue Code as amended and in effect during the years in issue. The central dispute in these consolidated cases concerns the proper characterization of the transfer of ownership of two adjoining buildings (the Belli Building) located in San Francisco from Melvin Belli to his two children, Caesar and Melia. Petitioners contend that the ownership was transferred as a result of an installment sale contends that ownership was transferred by gift. Deciding whether the transfer of ownership of the Belli Building was by gift or sale will resolve several intertwined, ancillary issues. After concessions, other issues for decision, grouped by docket numbers, are: Re: Melvin Belli's gift tax case (docket No. 1527-88): (1) whether the failure of Melvin Belli to report the transfer of the Belli Building as a gift (if we determine the transfer to Caesar and Melia was by gift) was due to fraud; (2) whether the interest which Melvin Belli transferred to his wife, Lia, in their marital residence (2950 Broadway, San Francisco) in 1978 was a 50 percent community property ownership interest, as petitioners contend, or a 100 percent separate property *405 ownership interest, as respondent contends; (3) whether certain payments (totaling $ 190,000) made by Melvin Belli in 1982 to the "Sonora Gold" account constituted deductible rental payments for his tenancy in the Belli Building, as petitioners contend, or gifts to Caesar and Melia, as respondent contends; (4) whether a $ 50,000 payment made by Melvin Belli to Caesar in 1983 was a gift, as respondent contends, or was a loan, as petitioners contend; Re: Melvin and Lia Bellis' (the Bellis') income tax case (docket No. 8249-87): (5) whether respondent properly disallowed rental expenses in the amount of $ 267,373 claimed on Schedule C of the Bellis' 1982 tax return; (6) whether any part of the underpayment in income tax for 1981 or 1982 is due to fraud, or alternatively whether any part of such underpayment for any of the years in issue is due to negligence; Re: Melia and Caesar's income tax cases (docket Nos. 6869-87 and 6870-87): (7) whether Caesar and Melia may depreciate the Belli Building using a stepped up cost basis (as opposed to a carry-over basis); (8) whether Caesar and Melia are entitled to interest deductions claimed in 1984 in connection with the alleged *406 sale; (9) whether the addition to tax for substantial understatement of income tax under section 6661 for 1982, 1983 and 1984 should be imposed against Caesar and Melia; (10) whether any part of the underpayment in income tax for 1982, 1983 and 1984 with respect to Caesar is due to negligence. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The parties' stipulation of facts and exhibits attached thereto are incorporated herein by this reference. 1. Taxpayers -- General Background
Melvin Belli, born on July 29, 1907, is a celebrated trial attorney, representing the famous as well as the infamous; he specializes in litigating both personal-injury and criminal matters. His success in obtaining large verdicts in tort actions, through the use of dramatic demonstrative evidence and innovative trial tactics, has earned him the title "King of Torts." Lia Belli at all relevant times was Melvin's wife. Melvin and Lia resided in San Francisco at the time they filed their petition for docket No. 8249-87. Melvin resided in San Francisco at the time he filed his petition for docket No. 1527-88. Melvin Caesar Belli, born on March 28, 1957, is the *407 son of Melvin and former wife, Joy Belli. He graduated from the University of San Francisco Law School in 1983, and has since that time practiced as a trial attorney in his father's law offices. Caesar resided in Sausalito at the time he filed his petition for docket No. 6870-87. Melia Belli, born on January 12, 1973, is the daughter of Melvin and Lia Belli. At the time a petition on her behalf was filed in docket No. 6869-87, she resided with her parents in San Francisco. 2. 1978 Transfer of Belli Building
Melvin Belli (Belli) acquired ownership of the Belli Building in April, 1959. The Belli Building is a complex of two adjacent brick buildings -- one built in 1850 and the other in 1875 -- located at 722 and 728 Montgomery Street, San Francisco, California. It has been designated a State historic landmark, and is a local tourist attraction. The Belli Building contains a basement, ground floor and two above ground levels of offices, part of which is utilized by Belli as the headquarters of his law practice and part of which is rented to other professionals and businesses. Belli's own office is on the ground level fronting on Montgomery Street. In many respects, *408 the Belli Building is a personification of Belli. It is jam packed with memorabilia collected over his long legal career and reflects his eccentricities. In 1978 and even earlier, Belli became concerned that he himself might become the defendant in a malpractice lawsuit and that his insurance coverage might be insufficient in the event of an adverse judgment. Lawyers were experiencing problems in obtaining malpractice insurance; as a result, many were "going bare" (i.e., without any insurance) and transferring all of their property to family members. Within this context, Belli spoke to John Jones (Jones), his long-time accountant and tax advisor, about transferring ownership of the Belli Building, which was "very dear" to him, to Caesar and Melia. Jones informed Belli that if Belli wanted to transfer the property to his children, tax wise it was preferable to sell them the building rather than give it to them. Jones explained to Belli that if he gave the children the Belli Building, he would incur a large gift tax liability and the children would take Belli's low cost basis rather than the higher current market value basis for depreciation purposes. In early 1978, Belli instructed *409 Thomas LoSavio (LoSavio), an associate in his law firm, to prepare deeds necessary to transfer to Caesar and Melia his interest in the Belli Building and in several parcels of improved real property located on South Washington Street in the town of Sonora, California (the Sonora properties). LoSavio did this between January and April, 1978. He understood that all the transfers were to be gifts, not sales. LoSavio further understood that the transfer to Caesar was to be outright (since Caesar had either turned 21 or was going to shortly turn 21; Caesar reached 21 on March 28, 1978) ; whereas, the transfer to Melia was to be in trust (since Melia was only 5), with Caesar as the trustee. Partly to inform Belli as to the differing gift tax consequences of an irrevocable versus a revocable trust, and partly to protect himself against perceived possible future recriminations, LoSavio prepared a one or two page memorandum to Belli discussing a number of issues, such as: the duration of Melia's trust; the powers of the trustee; whether the trust would end if Melia married while a minor; and whether the trust was to be revocable or irrevocable and the attendant gift tax consequences for *410 each type of trust. Belli returned the memorandum to LoSavio with an obscene notation disparaging to the Internal Revenue Service handwritten on the upper right-hand corner. LoSavio showed Vasilious Choulos (Choulos), Belli's law partner, a copy of the memorandum. LoSavio prepared and gave Belli deeds transferring ownership of the Belli Building and the Sonora properties to Caesar and Melia. Belli signed the deeds transferring the Sonora properties to Caesar individually and as "Trustee for Melia Belli as Beneficiary under the Trust Agreement dated this date" on April 20, 1978. Despite the language of the deeds, no trust agreements were ever executed. The acknowledgement of Belli's signature was dated September 26, 1978, by notary public Shirley Lee Jones, who was LoSavio's secretary. The deeds were not recorded until October 15, 1982 -- more than four years after their acknowledged execution. Despite signing the deeds to the Sonora properties, Belli delayed in signing the quitclaim deed transferring ownership of the Belli Building to Caesar and Melia. On Christmas, 1978, while alone at his office, he signed the quitclaim deed (the Christmas deed). Belli stated that "sentimentally" *411 he tries to be in his office for a part of every holiday. Belli's signature on the Christmas deed was acknowledged by notary public Joyce Revilla (Revilla) , Belli's secretary and long-time employee. Although the acknowledgement was dated December 25, 1978, Revilla was not in the office on that date. Belli has no recollection of either signing the quitclaim deed or giving it to Choulos or Caesar. A copy of the deed was produced by Choulos who claims that Belli gave it to him shortly after Christmas, 1978, telling him to give the deed to Caesar since "it is time for Caesar to take responsibility for the building." In 1978, Choulos was not only Belli's law partner, but a close personal friend and confidant. He was a named co-executor without bond in successive holographic wills executed by Belli in 1965 and 1976. He managed the business affairs of the law partnership as well as Belli's personal affairs. Belli referred to Choulos in a book written by Belli as follows: Choulos is my good right hand, administrator of the San Francisco office and coordinator of my other law offices in the U.S. and abroad. Without Choulos, we would all be lost in a morass of detail. He's loyal *412 and a damn good, fearless lawyer in his own right. Occasionally, we get to travel together, sometimes abroad. [M. Belli - My Life on Trial, p. 332 (1976).] There was very little about Belli's business and personal affairs that did not come to the attention of Choulos. Choulos regarded Caesar practically as his own son. And Caesar looked upon Choulos as a second father. Choulos' son, Alexander, and Caesar were the best of friends; they roomed together at college; often Caesar celebrated his birthdays at the Choulos' home. Sometime in 1981, there was a falling out between Belli and Choulos. In November, 1981, Belli assaulted Choulos, and Choulos eventually was locked out of his office. Choulos went to his office shortly before the locks were changed and gathered as many documents and files as possible. Among the documents which Choulos was able to preserve was a copy of the Christmas deed. As might be expected, animosity between Belli and Choulos now exists. Choulos testified that within a few days after receiving the Christmas deed from Belli (i.e., around the end of 1978), he (Choulos) delivered it to Caesar. However, previously in a pretrial deposition, Choulos *413 stated that delivery of the deed occurred in January, 1981. In reconciling the inconsistency between his testimony at trial and in the deposition as to the date he delivered the deed to Caesar, Choulos claims that his point of reference as to the delivery date of the deed to Caesar was the year in which Caesar turned 21. He claims that he mistakenly thought, when he gave his deposition, that Caesar turned 21 in 1981, whereas in fact Caesar turned 21 in 1978. This mistake was called to his attention by respondent's counsel, Martin D. Cohen, when he and Choulos went over the latter's deposition in preparation of Choulos' trial testimony. Caesar acknowledges that he received the deed from Choulos but claims that he received the deed in 1981. We find as a fact that delivery of the deed from Choulos to Caesar occurred in late 1978 rather than in 1981; thus, in 1978, the transfer was completed. 3. Transfer of Broadway Residence
On June 29, 1978, Melvin and Lia Belli purchased residential property located at 2950 Broadway, San Francisco (the Broadway residence). The price paid for the Broadway residence was $ 438,000, of which $ 130,000 was obtained by a loan secured by a first *414 deed of trust. The balance of the purchase price, $ 308,000, came from either joint tenancy property or community property under California law. A tracing of funds analysis reflected that Belli did not use his separate property to purchase the Broadway residence. By a quitclaim deed dated June 27, 1978, Melvin Belli transferred to Lia all of his interest in the Broadway residence. Belli filed a Federal gift tax return for 1978 reporting the transfer of his interest in the Broadway residence to Lia, as well as the transfer of his interest in the Sonora properties to Caesar and Melia, on December 29, 1987, which was after the receipt of the notice of deficiency relating to docket No. 1527-88. Respondent contends that the interest which Melvin Belli transferred to Lia was an 100-percent separate property ownership interest, rather than a 50-percent community property interest as reported on the gift tax return. 4. 1981 Transfer of Belli Building
By early 1981, apparently Belli had forgotten that he had signed the Christmas deed. Still worried about the insurance crisis, and remembering Jones' advice, Belli told Caesar that he would transfer ownership in the Belli Building *415 to Caesar and Melia by a long-term installment sale. Caesar was to do everything necessary to accomplish such a sale. The specific price and terms of sale were not agreed upon, but the purchase price was to be the property's current value, as determined by an appraisal (which Caesar was to obtain). It was further understood that the Belli Building would continue to house Belli's law practice for as long as Belli desired. In March, 1981, Caesar began taking responsibility with respect to the operation of the Belli Building. At the time, he was in law school and was clerking in his father's law offices. 5. Belli Building Renovations
Prior to 1981, Belli used the name "Sonora Gold" to conduct some of his business affairs, including the operation of the Belli Building. (Belli used the name "Sonora Gold" because he was born in Sonora, California which is in the gold country.) Caesar continued to use the "Sonora Gold" business name in managing the operations of the Belli Building. On November 23, 1981, at the time Belli's law partnership with Choulos was acrimoniously terminating, Caesar sent a formal, 30-day written notice from "Sonora Gold Co." to the law partnership *416 of Belli & Choulos advising it that the monthly rent on its office was being raised from $ 3,500 to $ 10,000 as of December 24, 1981, for reasons of expansion of office square footage and plans for remodeling the building. Towards the end of 1981, Caesar and Belli discussed plans to extensively repair and renovate the Belli Building at an estimated cost in excess of $ 300,000. Inasmuch as neither Caesar nor Melia had funds with which to pay for the work, Belli agreed to the three-fold rental increase. It was important that most of the renovations be completed prior to Belli's 75th birthday, July 29, 1982, because a large party was planned to celebrate the occasion. Belli made the final decisions regarding the renovations; the major improvement involved cutting out a wall between the two adjoining buildings in order to expand Belli's law offices. The total cost of renovating and repairing the Belli Building approximated $ 320,000. During 1982, Belli transferred a total of $ 344,746 to the Sonora Gold account, thereby enabling Caesar to pay for the repairs and renovations to the Belli Building. Of the $ 344,746 payments made by Belli to the Sonora Gold account, he deducted *417 $ 267,373 as past, current and advanced rent for his law offices; the balance ($ 77,373) was depreciated as leasehold improvements. (The Belli & Choulos law partnership terminated in November, 1981; in 1982, Belli was a sole practitioner.) Respondent disallowed the claimed $ 267,373 rental deduction. 6. Transfer of $ 50,000 to Caesar
In October 1983, Caesar asked his father to lend him $ 50,000 as part of a down payment towards the purchase of a house in Sausalito. On October 27, 1983, Belli drew a check to Caesar's order in the amount of $ 50,000. Caesar used the check in connection with the house purchase, and he caused title to the house to be taken in both his and his father's names, as joint tenants. Respondent contends that the $ 50,000 payment to Caesar by his father was a gift; petitioners contend the payment was a loan. 7. The Bellis' Audit
The joint 1981 Federal income tax return of Melvin and Lia Belli was selected for audit because of the high ratio of claimed charitable contributions to adjusted gross income. The case was first assigned in June, 1983 to Revenue Agent Julie DiVola (DiVola). For a variety of reasons, the examination was passed among *418 five different revenue agents during a three and one-half year period. Jones testified that in September, 1983, he first learned of the transfer of the Belli Building during the course of the audit examination. He agreed with DiVola that the transfer would generate a capital gain to Belli in an amount equal to the excess of the existing balance of the mortgage on the Belli Building over Belli's depreciated cost basis in the property. Such gain had not been reported on Belli's 1981 income tax return (which was filed in October, 1982) because Jones was unaware of the transfer at the time the 1981 return was prepared. The audit examination of the Bellis' 1981 tax return was delayed, each side accusing the other for the delay. DiVola eventually met with an associate of Jones, Mark Devereaux, on March 20, 1984 at the Belli Building. Among the documents provided to DiVola at the meeting were copies of the Bellis' 1980 and 1981 tax returns and a copy of Melia's 1981 tax return. DiVola noticed that the "Belli Building appeared on Melia's 1981 return." In May or June, 1984, DiVola was transferred to a new audit group. Before transferring to the new group, DiVola prepared a one page *419 file memorandum which, in part, identified the following as an audit item: Also, in the course of the audit, I came across the following item and planned to ask the representative about it: In 1981, 722 Montgomery Street falls off Belli's return (i.e., it is depreciated on the 1980 return but there is no reference to it's [sic] depreciation or sale in 1981). In 1981, 722 Montgomery street appears on his daughter's (Melia's) return. Thus, there appears to have been a gift. If so, you'll probably want to be sure that Gift Tax Returns were filed. In July, 1984, Revenue Agent David Stohlberg (Stohlberg) was assigned to continue the audit of the Bellis' 1981 return. He met with Jones on August 13, 1984 at Jones' office where he gave Jones a copy of DiVola's memorandum and requested documentation regarding the transfer of the Belli Building. Jones stated he should be able to have the requested documentation within two weeks, and so another appointment was set for August 27th. At the August 27th meeting, Jones informed Stohlberg that he had not yet received the requested documentation. A third meeting was held on September 11, 1984; Jones again stated he was having difficulty *420 obtaining the documentation. A brief digression here is deemed necessary to understand subsequent events. As a result of the break-up of the firm of Belli & Choulos in November, 1981, Belli agreed to pay Choulos $ 1,000,000, $ 100,000 of which was paid in cash, while the $ 900,000 balance was deferred. Choulos insisted that he receive title to the Belli Building as security for Belli's obligation to him because, as Caesar stated, Choulos did not trust Belli and he "knew that the building had a very emotional impact for [sic] all of us." Accordingly, Belli and Caesar, individually and as trustee for Melia, executed a Deed of Trust with respect to the Belli Building in favor of Choulos on June 11, 1982. As a consequence of the IRS demand for supporting documentation regarding Belli's 1981 transfer of the Belli Building to Caesar and Melia, Belli and Jones began "screaming" at Caesar about the documentation. Caesar then spoke with Choulos' attorney and it was agreed that payment of the remaining amount due Choulos by Belli would be accelerated and the Belli Building would be reconveyed to Belli and Caesar, individually and as trustee. The reconveyance occurred by a document *421 dated September 13, 1984. To further digress, by letter dated September 29, 1983, Caesar engaged Mills-Carneghi, Inc. to appraise the Belli Building "as of the end of December, 1978." Caesar claims that when the appraisal was ordered in September, 1983, he had in his possession the quitclaim deed dated December 25, 1978 and that he mistakenly used the date the deed was signed rather than the date he claims he received delivery of the deed (i.e., the beginning of 1981). The appraisal report (which he received in November, 1983) valued the Belli Building at $ 1,750,000 as of December 31, 1978. On September 13, 1984, Caesar caused to be prepared a grant deed, dated January 1, 1981, transferring ownership of the Belli Building from Melvin M. Belli, Sr. to Melvin Caesar Belli, Jr. individually and as trustee for Melia Belli as joint tenants; the deed was recorded on September 24, 1984. The acknowledgement portion of the deed, signed by Revilla, states that Belli appeared before her, a notary public of California, on January 1, 1981, to acknowledge that he had executed the deed. To make it appear that the acknowledgement occurred earlier than it did, Revilla scraped out the later 1984 *422 date appearing on her current notarial seal and in its place penned in the earlier 1981 date. Also in September, 1984, Caesar, with the assistance of Jones and Devereaux, prepared and signed a promissory note pursuant to which he agreed (individually and as trustee for Melia) to pay Belli the principal sum of $ 1,401,806.81, together with interest from January 1, 1981, at the rate of 6 percent per annum. Principal and interest was payable over 25 years in equal monthly installments of $ 9,031.81. The principal amount of the promissory note ($ 1,401,806.81) was determined on the basis that, as of January 1, 1981, the Belli Building had a value of $ 1,800,000, and was subject to a first mortgage in the amount of $ 398,193.19 ($ 1,800,000 - $ 398,193.19 = $ 1,401.806.81). Returning to our discussion of the events surrounding the tax audit, a fourth meeting was held on October 15, 1984, with Stohlberg going to Jones' office again in his quest for documentation regarding the transfer of the Belli Building. At this meeting Jones failed to mention to Stohlberg that he and Devereaux had assisted Caesar in preparing the promissory note; further, he failed to tell Stohlberg that the grant *423 deed (dated January 1, 1981) transferring the Belli Building from Belli to Caesar and Melia was prepared and recorded only one month prior to the meeting. Rather, Jones again told Stohlberg about his difficulty in obtaining documents from Belli, and he informed Stohlberg that Belli's instruction to him (Jones) on the subject of the Belli Building and the Bellis' 1981 return was: "Leave it off the return; nothing's been resolved yet." At a fifth meeting, on October 29, 1984, Jones presented to Stohlberg copies of the grant deed and the promissory note, both dated January 1, 1981. No other documents were produced. When asked by Stohlberg why the grant deed was not recorded prior to September 28, 1984, Jones replied that he had turned over (to Stohlberg) what was given to him. At Jones' request, Stohlberg prepared, with Devereaux's assistance, a computation of the additional tax due from the Bellis for 1981 on the assumption that Belli had transferred the Belli Building in 1981. Stohlberg regarded it as a non-binding, "what-if" calculation prepared at the taxpayer's request as a courtesy. Shortly after October 29, 1984, Stohlberg left the Belli audit. At the time he turned the *424 case file over to his supervisor, Stohlberg entertained suspicions regarding the sale of the Belli Building as a result of Jones' delay in responding to his requests, coupled with the time gap between the date of the grant deed, January 1, 1981, and its recordation date, September 28, 1984. In February, 1985, DiVola resumed the audit of the Bellis' 1981 return. From March to May, 1985, DiVola and Jones met several times. In connection with one of these meetings, DiVola prepared a list of questions to be asked of Jones in connection with the claimed sale of the Belli Building in January, 1981. DiVola's workpapers indicate the following questions and responses: Question:
The promissory note calls
for payment as of 1-31-81. How many payments
have been made? When?
Jones' response:
Payments did not start
until IRS inquired re transaction.
Question:
When was promissory note
executed?
Jones' response:
1981
Question:
When was Ticor (holder of
the mortgage on the Belli Building) notified
of the transfer?
Jones' response:
Mortgage holder probably
was not notified.
Question:
When was grant deed
executed?
Jones' response:
1981
Question:
Why wasn't the deed
recorded timely?
Jones' response:
Taxpayer was trying to
avoid revaluation for property tax purposes.
Question:
Did any cash exchange
hands in the transaction?
Jones' response:
No
Question:
How was the $ 1.8 million
sales price arrived at?
Jones' response:
Appraisal - late 1980.
Question:
Do the transferees have
the means to meet payment on the installment
note?
Jones' response:
Yes
Question:
Source of transferees'
income.
Jones' response:
Rent payments by Belli
should cover amounts due on note.
Question:
If this transaction was
considered a sale in 1981, why wasn't it
recorded on the return?
Jones' response:
Oversight by the
accountants.
*425 Towards the latter part of DiVola's involvement in the Belli case, she received from Jones the following statement from Caesar: As of January 1, 1981, I made an agreement with my father, Melvin M. Belli, covering the sale of the property located at 722 Montgomery Street from him to me and my sister, Melia Belli, in joint tenancy. Purchase price of the building was set at $ 1,800,000, which I had been informed by competent real estate people in the area was a reasonable price for the building. There was an existing mortgage on the building of $ 398,193.19, which my sister and I would assume and, in addition, executed a note to my father in the amount of $ 1,401,806.81, bearing interest at 6% per annum, to be amortized over a 25-year period. A note and grant deed were executed as of that date. The grant deed was not recorded because, in my opinion, there was no necessity for recording since the seller was a member of my family. Also, no payments were made on this note obligation for some period of time because my understanding of the tax laws permitted interest-free loans between members of the family. It was not until late 1984 when the Supreme Court entered its decision *426 regarding interest-free loans that we decided to record the grant deed, a deed of trust, and commence recognition of the interest factor involved in the note. Commencing January 1, 1981, my sister and I have operated the building, collected the rents, and paid all operating expenses. This statement is signed under penalty of perjury. DATED: April 16, 1985. /s/ MELVIN CAESAR BELLI In May, 1985, DiVola left the employ of the Internal Revenue Service. After DiVola's departure, Revenue Agent Geri Quinn was assigned to continue the audit. She met with Jones on July 10, 1985. Jones informed Quinn that the purchase price, as set forth in the promissory note, was based on an informal appraisal obtained by Caesar in December, 1980 and a formal, written appraisal performed in either 1977 or 1978. Quinn requested Jones to give her documentation to support either the informal or formal appraisal. By the end of July, 1985, Quinn was reassigned. She was skeptical of the contention that Belli sold the Belli Building to his children and felt that there were reasons to consider that fraud might be involved. Sometime between May, 1985 and January, 1986, Revenue Agent *427 Deborah Stanley was assigned to audit the Bellis' 1981 return. She spent little time pursuing the audit. In January, 1986, Revenue Agent Patricia Zenter assumed responsibility for the audit. In April, 1986, she wrote to the Bellis advising them that the examination of their 1981 return had been expanded to include 1982, 1983 and 1984. On July 2, 1986, Zenter and her supervisor met with Belli, Caesar, Jones and Devereaux at Belli's offices. Responding to Zenter's inquiry about the transfer of the Belli Building, Belli stated that he had to transfer all his property, including the Belli Building and his house, because of the malpractice insurance crisis. Caesar told Zenter that his reasons for the delay in recording the deed to the Belli Building was to avoid the "due on sale" clause of the mortgage and to avoid a reassessment for property tax purposes. On August 19, 1986, Zenter wrote up the case for fraud referral. ULTIMATE FINDINGS OF FACT (1) Caesar and Melia Belli acquired ownership of the Belli Building in 1978 by gift from their father, Melvin Belli. (2) the failure of Melvin Belli to report the gift of the Belli Building to Caesar and Melia was not due to fraud. *428 (3) the interest which Melvin Belli transferred to his wife, Lia, in their marital residence in 1978 was a 50 percent community property ownership interest. (4) the payments totaling $ 190,000 made by Melvin Belli in 1981 to the Sonora Gold account constituted a gift to Caesar and Melia, rather than deductible rental payments. (5) the $ 50,000 payment made by Melvin Belli to Caesar in 1983 was a loan and not a gift. (6) the fair rental value of the office space occupied by Melvin Belli's law firm in the Belli Building from January 1, 1982 to June 30, 1982, was $ 3,500 per month; the fair rental value of the leased space after July 1, 1982 (which was then both expanded in size and improved) was $ 10,000 per month. Accordingly, $ 81,000 of the $ 267,373 claimed by Melvin Belli as rent for the Belli Building is deductible; the balance ($ 186,373) was properly disallowed as a rental deduction for 1982. (7) no part of the underpayment in income taxes by Melvin and Lia Belli for years 1981 or 1982 was due to fraud. (8) the underpayment in income taxes by Melvin and Lia Belli for 1978, 1981 and 1982, and by Caesar Belli for 1982, 1983 and 1984, was due to negligence. OPINION
*429 1. Characterization of Transfer -- Gift vs. Sale
Section 2501 imposes a tax on the transfer of property by gift; and section 2512(b) provides that where property is transferred for less than an adequate and full consideration in money or money's worth, the amount by which the value of the property exceeds the value of the consideration is deemed a gift. Donative intent on the part of the transferor is not required; the application of the gift tax to a transfer is based on the objective facts of the transfer and the circumstances under which it is made, not on the subjective motives of the donor. Sec. 25.2511-1(g)(1), Gift Tax Regs. Petitioners contend that Belli transferred ownership of the Belli Building to Caesar and Melia pursuant to an oral sales agreement made in 1981, and that the purchase price, to be paid in installments, was to be the fair market value of the building, as determined by an appraisal which Caesar was to obtain. Petitioners further contend that Caesar was entrusted with the responsibility of determining the method, manner and time for payment and the *430 responsibility for drafting the necessary documents. As the trier of fact, our task is to decide that which truly occurred, rather than that which the respective litigants claim occurred. We have no divine power of knowing that which truly occurred between Melvin and Caesar Belli -- only they and God know for sure. However, after carefully listening to and evaluating the testimony of the various witnesses, and after reviewing the stipulation of facts and exhibits admitted into the record, we conclude that Caesar and Melia acquired ownership of the Belli Building in 1978 by gift from their father, rather than by installment sale in 1981. While truth itself is never in doubt, the search for it is fraught with difficulty. Diaz v. Commissioner, 58 T.C. 560, 564 (1972). Here, we can only infer what occurred based on the record. In our opinion, the most plausible scenario is that Belli, alone in his office at his desk on Christmas, 1978, thought about transferring the building he *431 loved dearly to his children. He knew that the insurance crisis dictated that he immediately transfer the building to Caesar and Melia, but he dreaded doing so. Finally, on a day of gift giving, he forced himself to sign the property over to Caesar and Melia. He then went to Choulos' office, where he placed the signed deed on Choulos' desk for later delivery. In December, 1978, Choulos and Belli were close friends, and Belli constantly used Choulos to interface with his family. Belli knew he could entrust Choulos, as his "good right hand," with the delivery of the deed to Caesar. Caesar, knowing for years that he and his sister would eventually own the Belli Building, was unemotional when, during the last week of December, 1978, Choulos handed him the deed to the Belli Building and instructed him not to record it. To Caesar, the receipt of the deed was not a memorable event. Being unorganized, he mislaid the deed on several occasions and eventually lost it. We do not believe delivery of the deed could have occurred in 1981, as petitioners contend. First and foremost, by 1981, the relationship between Belli and Choulos had deteriorated; they were no longer close friends. *432 Second, Choulos, in our opinion, would not have retained the deed from Christmas, 1978 to January, 1981 -- a period of more than two years. Such would have been out of character for Choulos. Far from being a procrastinator, he was the consummate administrator -- a person who followed through with an assigned task. Thus, in our opinion, the Belli Building was transferred to Caesar and Melia in 1978. Since such transfer was for less than an adequate and full consideration in money or money's worth, it was subject to the gift tax imposed by section 2501. 2. Fraud
We next address whether the understatement of gift tax for 1978 is due to fraud. Respondent has the burden of proving fraud by clear and convincing evidence. Section 7454(a); Rule 142(b). This burden may be met by showing that the taxpayer intended to conceal, mislead or otherwise prevent the collection of tax, and that there is an underpayment of tax. Candela v. United States, 635 F.2d 1272 (7th Cir. 1980); *433 Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). The existence of fraud is a question of fact. Grosshandler v. Commissioner, 75 T.C. 1, 19 (1980). Fraud is never presumed, Beaver v. Commissioner, 55 T.C. 85, 92 (1970); section 7454(a); Stone v. Commissioner, 56 T.C. 213, 220 (1971), and the taxpayer's entire course of conduct (including the making of false statements to or failing to cooperate with respondent's agents during the course of their examination) may establish the requisite fradulent intent. Spies v. United States, 317 U.S. 492 (1943); Powell v. Granquist, 252 F.2d 56, 60 (9th Cir. 1958); Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent claims that fraud in this case began with the facts and circumstances relating to Belli's disposition of the Belli Building and other property. Respondent argues that Belli's contempt towards *434 the IRS (and by implication, towards tax reporting) was graphically expressed through his inscribed profanity on the face of the LoSavio memorandum in 1978. Belli's failure to inform Jones of the facts necessary to file an "honest gift tax or income tax return," claims respondent, raises serious questions of his intent. However, respondent argues, "what makes the overall picture of fraud so egregious is the succession of calculated acts of concealment, falsification and deception in subsequent years, acts performed not merely by MMB [Belli], but by Caesar, Johnny Jones, Joyce Revilla and others in furtherance of a palpable conspiracy to conceal and defraud." Although we are disturbed by many of the actions taken in this case (specifically, the back dating of the acknowledgement on the grant deed and the misleading statements made to, and the protracted dealings by Jones with, the revenue agents), on the record before us, we do not find clear and convincing evidence of fraud. Belli had an enormous affinity for the Belli Building. Since he acquired it in 1959, the building had become associated with his name and reputation. Transferring his interest in the building was so traumatic *435 to Belli that he suppressed it from his consciousness. In his own way, he will always consider the building as his. Thus, we accept that Belli truly forgot he signed the deed on Christmas Day, 1978 and that in 1981 he thought he could heed the advice of Jones and sell the building to Caesar and Melia. Therefore, we cannot conclude, as respondent would have us do, that Belli intentionally concocted the 1981 sale to disguise the 1978 gift. Caesar marched to his own drum beat; he had slovenly habits. The IRS audit forced him to reconstruct that which he thought occurred earlier. It was clearly wrong for him to cause Revilla to backdate the acknowledgement on the grant deed and allow her to alter her notarial seal stamp. However, we believe his actions were not based upon an intent to commit tax fraud, but rather were the product of his embarrassment for not doing that which he told his father he would do and his not wanting to incur the wrath of his father. We accept Jones' testimony that he was not informed about the transfer of the Belli Building until after the tax audit commenced. We do not fault him for making misleading statements to the IRS, since he was repeating that *436 which had been represented to him by Caesar and Belli. Respondent argues that it is incredible that Belli would not have informed Jones about the 1981 transaction in connection with the preparation of the Belli's 1981 return in the fall of 1982. We disagree. Belli's relationship with Jones was as abrupt and volatile as was his relationship with others. Couple Belli's personality with his reluctance to focus on the fact that he no longer owned the Belli Building, and one can understand why the transfer of ownership of the building was not discussed or revealed to Jones at tax return preparation time in 1982. Respondent complains that Belli had a disdain for the IRS, as expressed by certain profanity written on the corner of a memorandum prepared by LoSavio. We agree with petitioners that "this pecksniffian complaint ill behooves respondent." Expressing one's feelings about the IRS (which would constitutionally be protected by the First Amendment -- cf. Texas v. Johnson, U.S. (June 21, 1989)) is not an element of tax fraud; if it were, our Federal prisons undoubtedly would be brimming *437 with such "tax convicts." We fail to discern any requirement that taxpayers must enjoy or look forward to paying their taxes. Profanity is a part of Belli's everyday vocabulary. The fact that he wrote an obscene notation on the LoSavio memorandum disparaging to the IRS does not mean he has a disdain for the IRS. The testimony of Ruth Klarer, the former bookkeeper in the Belli law firm from the summer of 1979 through the fall of 1981, in this regard is revealing. Klarer had no motive to shade her testimony in Belli's favor. In the fall of 1981, Klarer had asked Belli whether she should account for his purchase of a personal item (an expensive watch) as a deductible business expense. She testified that Belli flew into a rage, and fired her over it. He told her of his feeling about cheating on his taxes. The following colloquy between the Court and Klarer is deemed apposite: THE COURT: * * * did he have a disdain for the IRS as Mr. Cohen would have us believe? THE WITNESS: No. THE COURT: And his attitude towards the IRS, again, was that he didn't like paying tax money? THE WITNESS: That's the way I would put it, yes. * * * THE COURT: * * * do you think he intended *438 to cheat the Internal Revenue Service? THE WITNESS: No, I do not. He, in fact, made a statement to me at one time -- this is when we were having, he and I, personally were having problems [--] and he thought I said something about the purchase of a watch that was intended to cheat the IRS[.] [A]nd he said, "I have never done anything to cheat the IRS." I remember that clearly because he fired me over it. THE COURT: Elaborate on that point. He fired you over the buying of a watch that dealt with the Internal Revenue Service? THE WITNESS: The paying of a watch, the paying of a watch. THE COURT: That you bought a watch? THE WITNESS: No, he bought the watch. THE COURT: He bought a watch and what did that have to do with taxes?
THE WITNESS: He asked me how I had paid for his watch. THE COURT: I see and you had paid for the watch out of * * * firm money. THE WITNESS: No. He had handed me some cash in the lobby of the office, in the reception office, in the amount of $ 1,400.00 and at that time, he said to me, "This is partly to pay for my watch." It was a very expensive watch. Sometime later, he asked me how I had paid for the watch and I said I had bought a cashier's *439 check with the cash he gave me and I had written a check for the remainder. I made a statement about the tax consequences and said, very angrily, shouting, "I have never done anything to defraud --", no, he didn't use the word "defraud", I'm sorry "-- to cheat the IRS. I have never done anything and for you to state that is wrong." And he was screaming at me very badly. As previously stated, we believe Belli truly forgot that he had signed the deed transferring ownership of the Belli Building to Caesar and Melia on Christmas 1978. He did not know that Choulos had delivered the deed. Thus, we do not believe there was an intent on Belli's part, nor on Caesar's part, to evade taxes. In his Answer to the Petition, respondent claimed that part of the underpayment of the Belli's income tax for 1981 and 1982 was due to fraud. Except for the fact that Belli in 1982 deducted as rent $ 267,373 of the $ 344,746 payments made by him to the Sonora Gold account, we are unable to discern any rational basis for respondent's assertion of income tax fraud. While, as set forth below, we believe Belli is not entitled to the entire amount of the rental deduction claimed, he is entitled to a portion *440 thereof. The fact that a portion of the claimed rental deduction is not allowable does not give rise to addition to tax for fraud. Accordingly, respondent's assertion in this regard is not sustained. 3. Rental Deduction
In 1982, Belli deducted $ 267,373 as past, current and advanced rent for the space occupied by his law firm in the Belli Building. The record is far from satisfactory with regard to the fair rental for the space occupied by the Belli law firm in the Belli Building; nonetheless, since his law firm did occupy space in the building, he is entitled to a deduction for a portion of the purported rental payment. Prior to the break-up of the law firm of Belli & Choulos at the end of 1981, the law firm paid $ 3,500 per month for the space occupied. Nothing in the record indicates that the $ 3,500 monthly payment was unreasonable. Since the space occupied by the law firm as of July, 1982 was enlarged and improved, and because rents in the area were escalating, it is reasonable to expect that the previous $ 3,500 monthly rental would be increased. On November 23, 1981, Caesar sent a formal written notice to the law firm advising it that the monthly rental on its *441 space would be increased to $ 10,000 per month as of December 24, 1981. Although we recognize the increase was not at arm's length, but rather was a means to enable Caesar and Melia to pay for the renovations, nonetheless, in our opinion the $ 10,000 monthly rental is within the realm of reasonableness after the renovations were completed in July, 1982. (An appraisal by Arthur Gimmy Company (petitioner's expert) suggests a rental of $ 11,000 a month for the increased space; but there was no testimony in this regard.) Here, purportedly a portion of the $ 267,373 payment was for both past rent and advanced rent. As previously stated, the amount of rent prior to 1982 ($ 3,500 per month) was reasonable. With respect to the purported portion for advance rental payment, in general, an advance rental payment made by a cash basis taxpayer is not deductible in the year paid but, rather must be apportioned over the entire lease term. Cartan v. Commissioner, 30 T.C. 308, 317 (1958). To be deductible, the advance rental payment must satisfy the following three-pronged test: (1) *442 there must be an actual payment, not a mere refundable deposit, (2) there must be a substantial business reason for making the prepayment, not a prepayment simply to accelerate a tax deduction, and (3) there must not be a material distortion of the taxpayer's taxable income as a result of the prepayment. Grynberg v. Commissioner, 83 T.C. 255, 265-266 (1984). We are unable to conclude from the record herein that any part of the $ 267,333 payment in truth was an advanced rental payment. Even if we could reach such a conclusion, allowing a deduction for the "advanced rental payment" would result in a material distortion of the Belli's 1982 taxable income; thus no deduction would be allowable. Accordingly, we hold that for 1982, Belli is entitled to a rental deduction in the amount of $ 81,000 ($ 3,500 per month for the 6 month period January 1 - June 30, 1982; and $ 10,000 per month for the 6 month period July 1 - December 31, 1982) for the space occupied by his law firm in the Belli Building. Respondent properly disallowed the remainder ($ 186,373) of the claimed deduction. 4. Belli Building Renovations
Respondent claims that $ 190,000 of the total amount *443 Belli paid to the Sonora Gold account constituted a gift to Caesar and Melia. We agree. As owners of the Belli Building, Caesar and Melia reaped the benefits of the repairs and renovations through increased rentals. Belli paid for the repairs and renovations not in his capacity as a tenant of the building, but rather in his capacity as Caesar's and Melia's benefactor. Accordingly, we believe that such payments were made for improvements which benefited the owners of the building, Caesar and Melia, rather than the Belli law firm; hence, the payments are not deductible rental payments. Since the owners of the Belli Building in 1981 were Belli's children, his payment for the improvements constituted a taxable gift. On their respective tax returns for 1982, 1983 and 1984, Caesar and Melia each claimed deductions and depreciation attributable to the renovations and repairs to the Belli Building. The parties have reached an agreement as to the amount Caesar and Melia can expense and depreciate with respect to the approximately $ 320,000 spent to renovate and repair the Belli Building. 5. Transfer of $ 50,000 to Caesar
On October 27, 1983, Belli drew a check to Caesar's order *444 in the amount of $ 50,000. Although formal documentation was not prepared, the record clearly indicates that Caesar borrowed the funds from his father to purchase a house in Sausalito. To secure the loan, Belli was listed on the deed to the house as a joint owner with Caesar. While it may have been a better practice for Belli and Caesar to have executed a mortgage or some other type of security agreement, there is sufficient evidence for us to conclude that the $ 50,000 payment was a loan, rather than a gift, to Caesar. Accordingly, respondent's determination with respect to this issue is not sustained. 6. Section 6661
In docket Nos. 6869-87, 6870-87 and 8249-87, respondent determined an addition to tax under section 6661, which is applicable if there is a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of $ 5,000 or 10 percent of the amount required to be shown on the return. Section 6661(b)(1)(A). The amount of understatement is reduced by the portion of the understatement which is attributable to a taxpayer's treatment of *445 an item if there is or was substantial authority for such treatment, or if the relevant facts affecting the item's tax treatment are adequately disclosed on the return or in a statement attached to the return. Sections 6661(b)(2)(B)(i) and (ii). Petitioners neither had substantial authority for failing to report their respective income tax liabilities nor did they adequately disclose facts pertaining to such treatment. As such, each petitioner is liable for the section 6661 addition to tax. 7. Negligence
If any part of an underpayment of tax is due to negligence or intentional disregard of rules and regulations, section 6653(a) imposes a 5 percent addition to tax on the entire underpayment. In addition, for taxes payable after December 31, 1981, section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest payable under section 6601 with respect to the portion of the underpayment attributable to negligence. This addition to tax is presumed correct unless the taxpayers present sufficient evidence controverting its applicability. Luman v. Commissioner, 79 T.C. 846, 860-861 (1982); *446 Bixby v. Commissioner, 58 T.C. 757 (1972); Rule 142(a). Respondent determined that the underpayment in income taxes by Melvin and Lia Belli for 1978, 1981, and 1982, and by Caesar Belli for 1982, 1983, and 1984, was due to negligence. Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commisioner, 85 T.C. 934, 947 (1985). The entire underpayment in income taxes by Melvin and Lia Belli for 1978, 1981 and 1982, and by Caesar Belli for 1982, 1983, and 1984, was due to their negligence. Accordingly, respondent's determination in this regard is sustained. 8. Other Matters
Based on the record, we found as an ultimate fact that Melvin Belli transferred a 50 percent community property interest in the Broadway residence, rather than an 100 percent separate property interest to his wife. Such a finding speaks adequately to this issue. Our finding that the transfer of ownership of the Belli Building was by gift obviates any lengthy discussion as to Caesar and Melia's basis for depreciating the building and their entitlement to an interest deduction in *447 connection with the purported sale. Since there was no sale, Caesar and Melia must depreciate the building using a carry-over basis, and they are not entitled to the claimed interest deduction. Respondent and petitioners each engaged experts to determine the market value of the Belli Building as of various dates. The experts mutually agreed that the market value of Belli's fee simple interest in the Belli Building as of December 25, 1978, was $ 1,385,000; however, such value did not take into account the impact, if any, of existing leases. The Court expects the parties to settle the valuation issue. If not, a hearing in this regard will be held. To reflect the foregoing and the concessions by the parties, Decisions in all of these dockets will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Melvin Caesar Belli, docket No. 6870-87; Melvin M. and Lia T. Belli, docket No. 8249-87; and Melvin M. Belli, 1527-88.↩
*. Respondent also determined an addition to tax under section 6653(a)(2)↩ in an amount to be determined.
*. Petitioners concede these deficiencies. ** Respondent also determined an addition to tax under section 6653(a)(2) in an amount to be determined. *** In his Answer to the Petition, respondent claimed that part of the underpayment for 1981 and 1982 was due to fraud within the meaning of section 6653(b)↩.
*. Deficiencies for 1978, 1982 and 1984, in part, were determined in the alternative and thus are duplicative.↩